UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

─────────────────────────────────────X

NEHRU GUMBS,

                 Petitioner                   **MEMORANDUM AND ORDER**
                                               10-CV-848 (SLT)

    - against -

PHILIP D. HEATH,

                 Respondent.

─────────────────────────────────────X

**TOWNES**, District Judge

    Petitioner Nehru Gumbs ("Gumbs" or "Petitioner"), who is incarcerated pursuant to a judgment of the New York State Supreme Court, Kings County, petitions this Court for a writ of habeas corpus under 28 U.S.C. § 2254. Following a jury trial, Petitioner was convicted of manslaughter in the first degree and criminal possession of a weapon in the second degree for which he was sentenced to a determinate term of 25 years imprisonment on the manslaughter conviction and a determinate term of 15 years imprisonment on the criminal possession of a weapon conviction, with both sentences running concurrently. In this habeas petition, Petitioner, appearing *pro se*, raises two arguments: (1) the evidence at trial was legally insufficient to prove beyond a reasonable doubt the crimes for which he was convicted, and (2)

the sentence imposed was unduly harsh and excessive.  For the reasons set forth infra, the petition is denied.

**BACKGROUND**

In the early morning hours of January 1, 2004, Tralane Walker was shot and killed by an assailant who fired on him and a group of friends as they stood on the sidewalk in front of 618 East 96th Street in Canarsie, Brooklyn.  Shortly after noon that same day, Petitioner was arrested and brought to the 67th Precinct, where he made statements admitting his involvement in the shooting but denying that he had intended to kill anyone. Petitioner was subsequently indicted on two counts of murder in the second degree (N.Y. Penal Law §§ 125.25[1], [2]), one count of criminal possession of a weapon in the second degree (N.Y. Penal Law § 265.03[2]), and one count of criminal possession of a weapon in the third degree (N.Y. Penal Law § 265.02).  In July 2005, he went to trial before Justice Del Giudice and a jury.  At the close of Gumbs' case, the People dismissed the murder in the second degree count which was based upon depraved indifference to human life (to wit, the count pursuant to PL § 125.25[2]) (Id. at 617-618).  Additionally, the People requested a charge on the lesser included offense of manslaughter in the first degree pursuant to New York Penal Law § 125.20(1) (Id. at 638-639, 753-762).

Petitioner was convicted of manslaughter in the first degree and criminal possession of a weapon in the second degree. On October 11, 2005, he was sentenced to concurrent terms of imprisonment of 25 years on the manslaughter conviction and 15 years on the weapon conviction (Sentencing Tr. at 17).

I.   *The People's Case*

Twelve witnesses testified for the People at trial, including two brothers – Brian and Mark Bristol – who were standing with the victim at the time of the shooting. Brian Bristol testified that he and Corey Coates had attended a house party approximately two weeks prior to the incident. There, they encountered Gumbs (Trial Transcript ("Tr.") at 144, 240) who Brian Bristol met for the first time that night (Id. at 140). Corey Coates, on the other hand, stated that he knew Gumbs previously (Id. at 240). Brian Bristol and Corey Coates testified to a possible motive for the shooting. They stated that while at the party, Corey Coates and Gumbs became engaged in an argument concerning alleged disrespectful comments Corey Coates had previously made to others regarding Gumbs' girlfriend (Id. at 146 [Brian Bristol]; 241, 245 [Corey Coates]). Corey Coates admitted to Gumbs that he had been talking about her "because [Gumbs] said something about [Corey Coates' own] little cousin" (Id. at 244-245). Additionally, Corey Coates told Gumbs that he (Corey) had previously had a one-night stand with Gumbs'

girlfriend (Id. at 245). Brian Bristol testified that although there was no physical altercation between Corey Coates and Gumbs that evening, he overheard Gumbs threaten Corey Coates by saying: "You know my shit. Get down, I lay you down" (Id. at 147).

On January 1, 2004, at around 1:00 AM, Brian and Mark Bristol, their friend Jason Coates, and the victim, were all standing on the sidewalk outside the home of the Bristol brothers' aunt, which was located near 618 East 96th Street in Canarsie, Brooklyn (Id. at 140-142; 171). According to Brian Bristol, around 1:15 AM, he saw Gumbs walking towards the four of them on the same side of the street (Id. at 142). When Gumbs was approximately four house-lengths away, he crossed the street, walking diagonally (Id. at 185). Upon Gumbs reaching the other side and when he was nearly directly across the street from the aunt's house (Id. at 148), Gumbs yelled to the group, "Where is Cor[e]y at?" (Id. at 142). The group's attention turned to Gumbs (Id. at 142). Brian Bristol responded by saying, "Who is that?", upon which he witnessed Gumbs draw a firearm and fire shots at the group (Id. at 143). He saw "fire" and "one spark" come from Gumbs' gun (Id. at 148-149). Brian Bristol further stated that he affirmatively observed Gumbs as the shooter, nothing was obstructing Gumbs' face at the time of the incident, and there was an illuminated street light near the spot where Gumbs' stood when firing (Id. at 143).

Mark Bristol testified that he was unable to identify the shooter as he did not get a good look at him at the time of the incident (Id. at 265, 279). However, he nevertheless stated that he saw a person cross the street, and upon reaching the other side, heard him yell out, "Yo, where Corey at?," to which his brother Brian responded, "Who that?" (Id. at 262). The shooter shot twice following this verbal exchange (Id. at 262).

Brian and Mark Bristol fled the scene, but returned 15 minutes later. There, they saw the victim laying on the ground, with a single gunshot wound to the forehead[1] (Id. at 150, 263). Shortly thereafter, they encountered the police who took them to the 67th Precinct for questioning (Id. at 197, 264). While at the precinct, the Bristols told the police what they saw regarding the incident (Id. at 206, 265).

Detective Robert Reedy testified that as a result of this interview with Brian Bristol, the police began looking for Gumbs (Id. at 381). Accordingly, at approximately 12:30 PM on January 1, 2004, Reedy and a group of detectives arrested Gumbs following a brief investigation into his whereabouts (Id. at 381-382). Gumbs was taken to the 67th precinct and placed in an interview room. There, he was questioned by Reedy and his partner, Det. Michael Hinrichs. Hinrichs testified that Gumbs was not threatened in any way and he chose to give a statement

---

[1]This single gunshot wound was the cause of death (Id. at 321).

immediately after being Mirandized (Id. at 464).  Hinrichs
recalled Gumbs stating, in sum and substance, that he was on his
way to see a friend and at first did not want to travel down 96th
Street because Corey Coates lived near there and he had "some
sort of beef" with Corey (Id. at 465).  Gumbs nevertheless walked
down 96th Street anyway and came upon a group of people.  The
members of the group startled him which caused him to pull out a
gun he had been carrying (Id. at 465).  While attempting to
protect himself and get the group to back away of him, the gun
inadvertently went off (Id. at 466).

After Gumbs made this statement, the detectives gave Gumbs
the opportunity to draft a written statement.  At trial, Reedy
read the written statement, which stated, in pertinent part:

> "I [saw] a few guys were standing around.  I was
> drifting a little so I felt scared and I crossed the street.
> They watched me as I crossed the street and one of the guys
> asked me 'Who are you?' and I said , 'Corey, is that you?'
> I noticed three guys started walking towards me, so I had a
> small pistol that I found back in October while walking down
> the street.  I had it for protection because I got robbed
> before around this time of year.  So I thought that they
> were going to do something to me.  So I pulled it out to
> scare them.  I was so nervous I tapped the trigger and the
> gun went off.  I never meant for anything to happen, and I'm
> very sorry for what happened to the man who got shot" (Id.
> at 399-400).

Shortly after Gumbs drafted the written statement, an
Assistant District Attorney arrived at the precinct and made a
videotape statement of Gumbs.  In this videotape statement, which

was played for the jury[2] (Id. at 111), Gumbs stated, in pertinent part, that on the day in question, he was walking alone in the neighborhood on the way to see his friend Elijah, who lived near 96th Street.  As he approached a group of people on 96th Street, he became "nervous" and began crossing the street.  He did not recognize the individuals in this group but believed it to consist of approximately eight or nine people.  He noticed they were watching him when one person in the group "came out" and asked him, "Who a[re you]?"  Gumbs responded, "Corey, is that you?"  At that point, three of them started walking towards him which caused him to "panic" and draw a "small pistol" from his pocket.  Gumbs stated he "wasn't thinking" and that he was using the gun "as a form of protection."  He only had the gun in his hand "for a few seconds" before it went off "because [he] was shaking."  He then ran back to the Crown Heights neighborhood in Brooklyn where he lived and "ditched the gun in the grass" near his apartment building.

Gumbs further stated that he "never meant [for any]thing to happen to [the victim] ... [he] didn't know what was going on ... [he] wasn't intending to shoot [any]body."  Gumbs admitted that he knew Corey Coates from the neighborhood and they had seen one another other "about a dozen times" previously.  He recalled hearing that Corey had been "bad-mouthing" him and on the night

---

[2]This video has been independently viewed by this Court.

of the party two weeks before the shooting, Corey told Gumbs that he had had sex with Gumbs' girlfriend in the past.

Det. Delarosa, an expert in the field of microscopic identification, examination, and comparison of firearms and ballistics evidence (Id. at 291), testified that the bullet recovered from the victim's head held the characteristics of one that is .38 caliber in size and weight and more likely than not was discharged from a revolver (Id. at 304, 311-312). He further opined that in order to discharge a .38 caliber bullet from a revolver, one would need to exact a force of 9 to 11 pounds on the trigger (Id. at 304-305).


II. *Petitioner's Case*

Petitioner testified in his own defense at trial. He acknowledged that he had spoken with Corey Coates "about two weeks before New Year's" (Id. at 518). As to that conversation, Petitioner stated:

> "I basically spoke to [Corey Coates] about some rumors I heard, you know, and then we sat there. [Our conversation] wasn't nothing real serious or anything like that. He was honest with me. He told me what he said ... we just left it at that and I never [saw] him after that" (Id. at 518).

Petitioner denied ever threatening Corey Coates at any time (Id. at 519-520). Nonetheless, he was arrested on January 1, 2004 around 12:30 PM (Id. at 520) and taken to the precinct.

He denied that he had fired shots at anyone on January 1, 2004, and denied even having been on 96th Street at that time either (Id. at 517).

According to Petitioner, at the precinct, Dets. Reedy and Hinrichs informed him that the victim, who happened to be the brother of his friend, had been fatally shot (Id. at 525). They also told him that they had "ten witnesses that placed [Petitioner] at the crime, a weapon, [that he was] facing 25 years to life, and, basically, [that his only option was to] cooperate with them" (Id. at 525-526). Det. Hinrichs told Petitioner that "he felt the crime was an accident [and] that it wasn't meant to happen [ ] and if [Petitioner] [were] to write a statement [to] tell the [District Attorney] what actually [ ] happened ... [the District Attorney] would be lenient on [him] and everything would be okay" (Id. at 526).

At this point Petitioner felt "confused, nervous, scared, angry, upset" and believed that he was "in a bad situation" (Id. at 527) because someone he knew "had got[ten] hurt" and that the police "wanted [him] to actually confess to [the] crime" (Id. at 527). Petitioner followed Det. Reedy's instructions (Id. at 530) because he "thought things were going to be okay because that's what [was] promised" (Id. at 531).

Further, Petitioner stated that Det. Reedy "coached [him] through that statement" and "told [him] what to write" (Id. at

530). Other detectives were present in the interview room as well, and were encouraging him to draft a written statement (Id. at 532). When he asked the detectives what he should say about the gun, they told him, "just basically sa[y] this is New York ... you could just say you found it walking down the street" (Id. at 532). Petitioner asserted that the contents of his written statement were not true and the reason he drafted it was because the police were telling him that his "only [chance] of getting out of this situation is to write a statement and say that it was an accident and be remorseful" (Id. at 528).

At some point thereafter, an Assistant District Attorney arrived at the precinct. Det. Reedy told him (Petitioner) "to say the same thing" in his videotape statement as he did in his written statement (Id. at 534) and Petitioner only agreed to make a videotape statement because the detectives led him to believe that "[he] would be okay[,] [t]hat [he] wouldn't have to face any charges" (Id. at 534). At the time Petitioner was about to make the videotape statement, he was "very nervous", "scared", "basically upset", and "just wanted to get out of the situation" (Id. at 535). He ultimately asserted that nothing that he had stated in either the written or videotape statements was true in reference to whether he was on 96th Street on January 1, 2004 or fired a gun at anyone (Id. at 533).

On cross-examination at trial, Petitioner was questioned as to the believability of his testimony, in particular, whether it was reasonable for a person to think that if he confessed to killing someone he would be able to just leave the precinct and go home upon confessing (Id. at 552, 559, 571). Petitioner maintained that he was manipulated and coerced into drafting the written statement (Id. at 573) and further, that the contents therein were, in large part, provided by the detectives (Id. at 562-570). He also re-asserted that the detectives provided him with nearly the entirety of the contents of his videotape statement (Id. at 580-584, 591-609).

Petitioner's counsel also elicited testimony from Det. Wayne Carey, who testified, in pertinent part, that he had been involved in the subject investigation and conversed with Brian Bristol on the street near the crime scene (Id. at 515) at around 3:00 AM on the date of the incident (Id. at 510). He stated that Brian Bristol initially told him that he (Brian) "did not know what happened" and did not know who performed the shooting (Id. at 511).

On cross-examination, however, Det. Carey stated that he had occasion to speak with Brian Bristol again at the precinct approximately an hour and a half after their initial conversation (Id. at 512). During this second conversation, Brian Bristol identified Gumbs as the shooter (Id. at 513) and described the

incident.  Brian Bristol told him that he observed Gumbs on the
same side of the street as his group, that Gumbs then crossed the
street, "called Corey's name", and "pulled out a handgun and
pointed it at [the group] and fired two shots" (Id. at 513).
Further, Brian Bristol told him that he saw "flashes coming from
the gun" (Id. at 513), fled as a result, and then returned to the
scene approximately 15 minutes later (Id. at 513).  Carey
memorialized both of these conversations into one single document
which was drafted "a few minutes" after this second conversation
(Id. at 514).

The People argued on summation that Gumbs intended to fire
the weapon (Id. at 709-710), and believed he was shooting at
Corey Coates but fatally struck the victim instead (Id. at 705,
713).  The Court instructed the jury as to transferred intent
(Id. at 756) (see New York State Criminal Jury Instructions
("CJI") 2d § 125.20[1] ["In a case of 'transferred intent,' add
the following paragraph: Under [New York] law, it is not required
that the person who dies be the same person who was intended to
be injured."]).


III.  *The State Appeal and Present Petition*

As previously noted, Petitioner was convicted of
manslaughter in the first degree and criminal possession of a
weapon in the second degree and was sentenced to concurrent terms

of imprisonment of 25 years on the manslaughter conviction and 15
years on the weapon conviction.  He thereafter appealed to the
New York State Supreme Court, Appellate Division, Second
Department and made the following three arguments: (1) the
evidence was legally insufficient to establish his guilt beyond a
reasonable doubt; (2) the verdict of guilt was against the weight
of the evidence; and, (3) the sentence imposed was excessive.
The Appellate Division initially held that Petitioner's
contention that the evidence was legally insufficient as to the
criminal possession of a weapon in the second degree conviction
was unpreserved for appellate review as no such contention was
raised before the New York State Supreme Court (see People v
Gumbs, 58 AD3d 641 [N.Y. App. Div. 2009]).  It nevertheless
rejected all of Petitioner's arguments on the merits, holding
that upon "viewing the evidence in the light most favorable to
the prosecution ... it was legally sufficient to establish the
defendant's guilt of manslaughter in the first degree and
criminal possession of a weapon in the second degree beyond a
reasonable doubt" (People v Gumbs, 58 AD3d at 641 [internal
citations omitted]).  The Appellate Division also held that "the
verdict of guilt ... was not against the weight of the evidence,"
and "the sentence imposed was not excessive" (People v Gumbs, 58
AD3d at 641-642).  Petitioner sought leave to appeal to the New
York State Court of Appeals.  By certificate dated March 19,

2009, his motion was denied (see People v Gumbs, 12 N.Y.3d 784 [N.Y. 2009]).

Petitioner timely filed a petition, dated January 20, 2010, for a writ of habeas corpus (see 28 U.S.C. § 2244[d][1][A]), arguing: (1) the evidence at trial was legally insufficient to prove beyond a reasonable doubt the crimes for which he was convicted, and (2) the sentence imposed was unduly harsh and excessive.  This Court addresses these two arguments in detail below.

**DISCUSSION**

I.   Standard of Habeas Review

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") establishes a standard that federal habeas courts must apply when reviewing state court convictions (see 28 U.S.C. § 2254[d]).  The statute provides, in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding (Id.).

"[A] decision by a state court is 'contrary to' [ ] clearly established [federal] law if it 'applies a rule that contradicts

the governing law set forth in [Supreme Court] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [federal] Court and nevertheless arrives at a result different from [Supreme Court] precedent'" (<u>Dunlap v Burge</u>, 583 F.3d 160, 164 [2d Cir. 2009], quoting <u>Williams v Taylor</u>, 529 U.S. 362, 405-06 [2000]; <u>see</u> <u>Price v Vincent</u>, 538 U.S. 634, 640 [2003]).  "[A] decision involves an unreasonable application of federal law 'if the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case'" (<u>Dunlap</u>, 583 F.3d at 164, quoting <u>Williams</u>, 529 U.S. at 413).  In resolving whether the state court proceedings resulted in an unreasonable determination of the facts in light of the evidence, pursuant to 28 U.S.C. § 2254(d)(2)[3], the Second Circuit has directed that AEDPA deference is to be given to the state court's merit-based rejection of said claims on direct appeal (<u>see</u> <u>Miranda v Bennett</u>, 322 F.3d 171, 178-179 [2d Cir. 2003]).

---

[3] The Second Circuit has acknowledged that a discrepancy may exist between 28 U.S.C. §§ 2254(d)(2) and 2254(e)(1) (<u>see</u>, e.g., <u>Jones v Murphy</u>, 694 F.3d 225, 238 [2d Cir. 2012]; <u>Tatum v Lempke</u>, 481 Fed.Appx. 659, 661 [2d Cir. 2012]).  Specifically, 28 U.S.C. § 2254(e)(1) provides, in pertinent part, that "a determination of a factual issue made by a State court shall be presumed to be correct," which is arguably more deferential than the "unreasonable determination" fact-finding standard set forth in 28 U.S.C. § 2254(d)(2) (<u>see</u> <u>Tatum</u>, 481 Fed.Appx. at 661).

Here, as to Petitioner's legal insufficiency argument, he does not contend that the adjudication of his claims resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. Rather, the issue presented is whether the adjudication of the claims resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding (see generally Haims v Senkowski, 114 Fed.Appx. 16, 18 [2d Cir. 2004]).

II. Petitioner's Legal Insufficiency Claims

A. *Procedural Bar*

In his habeas petition, Petitioner contends that the evidence was legally insufficient to establish his guilt of manslaughter in the first degree and criminal possession of a weapon in the second degree on the basis that the People failed to prove beyond a reasonable doubt that he intended to cause serious physical injury or that he possessed a firearm with the intent to use it unlawfully against another. In response, the People argue initially that Petitioner's claim relating to the weapon conviction is procedurally barred from this Court's habeas corpus review. The People also argue that all of Petitioner's legal sufficiency claims should be rejected on the merits in their entirety. This Court initially addresses the procedural

issue and concludes that Petitioner's claims regarding his criminal possession of a weapon conviction are procedurally barred.

Generally speaking, a claim resolved on independent and adequate state procedural grounds is not subject to federal habeas review (see, e.g., Coleman v Thompson, 501 U.S. 722, 729-730 [1991]; Downs v Lape, 657 F.3d 97, 101-102 [2d Cir. 2011]). The Second Circuit Court of Appeals has repeatedly held that the "contemporaneous objection rule is a firmly established and regularly followed New York procedural rule" (Downs, 657 F.3d at 104; see, e.g., Whitley v Ercole, 642 F.3d 278, 286 [2d Cir. 2011]; Garvey v Duncan, 485 F.3d 709, 718 [2d Cir. 2007]). "New York's contemporaneous objection rule provides that a party seeking to preserve a claim of error at trial must lodge a protest to the objectionable ruling 'at the time of such ruling ... or at any subsequent time when the [trial] court had an opportunity of effectively changing the same'" (Whitley, 642 F.3d at 286, quoting N.Y. Crim. Proc. Law § 470.05[2]). Noncompliance with this rule precludes federal habeas review absent a finding that such treatment would be "exorbitant" (Garvey, 485 F.3d at 718).

In this case, Petitioner's counsel generally moved to dismiss all charges against Petitioner at the conclusion of the People's case (Tr. at 497). Counsel then went on to specifically

argue that "as to the two theories of the homicide that are in the indictment" the evidence failed to establish a "specific intent to murder anyone" (Tr. at 497). This motion was denied (Tr. at 497). Thereafter, at the conclusion of Petitioner's case and upon the close of all the evidence, Petitioner's counsel made another motion, this one to dismiss all the charges against Petitioner on the general basis that the People had "failed to establish a case beyond a reasonable doubt" (Tr. at 617). Notably, counsel did not move for dismissal of the criminal possession of a weapon in the second degree charge in any matter of specificity. "[E]ven where a motion to dismiss for insufficient evidence [is] made, the preservation requirement compels that the argument be *specifically* directed at the alleged error" (Donaldson v Ercole, No. 06-5781-pr, 2009 WL 82716, at *2 [2d Cir. Jan. 14, 2009] [emphasis added], quoting People v Hines, 97 N.Y.2d 56, 62 [N.Y. 2001; see People v Carncross, 14 N.Y.3d 319, 324-325 [N.Y. 2010]). Accordingly, on direct appeal, the Appellate Division held that "[Petitioner's] contention that the evidence was legally insufficient to establish his guilt of criminal possession of a weapon in the second degree is unpreserved for appellate review as no such contention was raised before the Supreme Court" (People v Gumbs, 58 AD3d at 641). Although the Appellate Division's order did not articulate the particular reasoning upon which it reached this conclusion,

review of the trial transcript and the parties' appellate briefs
suggests that the Appellate Division relied upon counsel's
failure to adhere to the requirement that the argument following
objection be specifically directed at the alleged error (see
Donaldson, 2009 WL 82716, at *2; People v Carncross, 14 N.Y.3d at
324-325; People v Gray, 86 N.Y.2d 10, 19 [N.Y. 1995]; cf. People
v Hardy, 4 N.Y.3d 192, n.3 [N.Y. 2005]).

Since the Appellate Division's determination constitutes an
independent and adequate state procedural ground, Petitioner's
sufficiency argument relating to the weapon possession conviction
is procedurally barred.  This is true even though the Appellate
Division reviewed and determined the merits of Petitioner's
unpreserved claim (see Murden v Artuz, 497 F.3d 178, 191 [2d Cir.
2007]).

There are certain limited circumstances where a federal
court may conduct a habeas review of claims resolved on state
procedural grounds.  Specifically, a procedural default is
excused if the petitioner can "demonstrate cause for the default
and actual prejudice as a result of the alleged violation of
federal law, or demonstrate that failure to consider the claims
will result in a fundamental miscarriage of justice" (Rush v
Lempke, No. 06-5781-pr, 2012 WL 4820810, at *3 [2d Cir. Oct. 11,
2012], quoting Coleman v Thompson, 501 U.S. at 750).  However,
Petitioner has not asserted any cause or prejudice in connection

with the failure to preserve this claim, nor has he alleged that there would be a fundamental miscarriage of justice resulting from a failure to consider same.

Accordingly, Petitioner's challenge to the sufficiency of the evidence with respect to his criminal possession of a weapon in the second degree conviction is procedurally barred (see Downs, 657 F.3d 97; Monroe v Kuhlman, 433 F.3d 236, 245 [2d Cir. 2006]).

In contrast, the Appellate Division found that Petitioner's sufficiency claim regarding his manslaughter conviction was adequately preserved. As previously mentioned, at the close of the People's case, Petitioner's counsel specifically argued that the People had failed to establish the intent element regarding the two homicide charges (Tr. at 497). Under the circumstances, this argument was sufficient to "apprise the trial judge and the prosecutor of the nature and scope of the matter [counsel] contest[ed] ... [and] alert[ed] the court to defendant's position" (Garvey, 485 F.3d at 714 [internal citation omitted]; cf. Aparicio v Artuz, 269 F.3d 78, 90 [2d Cir. 2001]).

B. *The Merits of Petitioner's Legal Insufficiency Claims*

"[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact

necessary to constitute the crime with which he [or she] is
charged'" (Jackson v Virginia, 443 U.S. 307, 315 [1979], quoting
In re Winship, 397 U.S. 358, 364 [1970]; see Langston v Smith,
630 F.3d 310, 314 [2d Cir. 2011]).  On habeas review, a district
court is not "retrying the case, nor [is it] second-guessing the
state court's interpretation of its own law" (Gutierrez v Smith,
702 F.3d 103, 113 [2d Cir. 2012]).  Rather, a district court
reviews the decision of the state court under the federal
sufficiency standard set forth by the Supreme Court in Jackson
(443 U.S. 307) (see Gutierrez, 702 F.3d at 113; Epps v Poole, 687
F.3d 46, 50 [2d Cir. 2012]).

The relevant question under Jackson is "whether, 'after
viewing the evidence in the light most favorable to the
prosecution, any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt'"
(Gutierrez, 702 F.3d at 113, quoting Jackson, 443 U.S. at 319).
The Jackson inquiry "does not focus on whether the trier of fact
made the *correct* guilt or innocence determination, but rather
whether it made a *rational* decision to convict or acquit"
(Herrera v Collins, 506 U.S. 390, 402 [1993] [emphases in
original]).  The federal court in a habeas proceeding may not
overturn the state-court decision rejecting a sufficiency
challenge unless the decision was "objectively unreasonable"
(Parker v Matthews, __ U.S. __, 132 S.Ct. 2148, 2152 [2012]

[internal citation omitted]; see Santone v Fischer, 689 F.3d 138, 148 [2d Cir. 2012]).  Furthermore, Jackson allows juries "'broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors draw reasonable inferences from basic facts to ultimate facts'" (Santone, 689 F.3d at 148, quoting Coleman v Johnson, __ U.S. __, 132 S.Ct. 2060, 2064 [2012]).  "When considering the sufficiency of the evidence of such a state conviction, a federal court 'must consider the evidence in the light most favorable to the prosecution and make all inferences in its favor,' and, in doing this, 'must look to state law to determine the elements of the crime'" (Gutierrez, 702 F.3d at 113, quoting Fama v Comm'r of Corr. Servs., 235 F.3d 804, 811 [2d Cir. 2000]).

Although this Court has determined that Petitioner's challenge to the sufficiency of his weapon conviction is procedurally barred, this Court will nevertheless address both of Petitioner's sufficiency claims on their merits.  Petitioner was convicted of manslaughter in the first degree under New York Penal Law § 125.20(1).  Pursuant to the CJI, in relevant part, a person is guilty of manslaughter in the first degree when, with intent to cause serious physical injury to another person, he causes the death of such person or of a third person.  Serious physical injury means impairment of a person's physical condition which creates a substantial risk of death or which causes death.

Further, a person acts with intent to cause serious physical injury to another when his conscious objective or purpose is to cause serious physical injury to another (see CJI 2d § 125.20[1]). Petitioner was also convicted of criminal possession of a weapon in the second degree under New York Penal Law § 265.03(2)[4]. A person is guilty of criminal possession of a weapon in the second degree when he knowingly possesses a loaded firearm with the intent to use it unlawfully against another. Notably, "[t]o show intent the [People] must prove what was in the mind of the accused ... [and] whether a deliberate intent was formed must be drawn from all the circumstances of the case" (Mallette v Scully, 752 F.2d 26, 32 [2d Cir. 1984]; see Policano v Herbert, 453 F.3d 79, 89-90 [2d Cir. 2006]; see also Pennington v Bennett, 372 Fed.Appx. 144, 146-147 [2d Cir. 2010]).

Here, Petitioner contends that the evidence adduced at trial was insufficient to establish manslaughter because the proof failed to demonstrate that he intended to cause serious physical injury in causing the death of the victim. Petitioner also challenges his weapon conviction on the ground that the People failed to establish that he possessed a firearm with the intent to use it unlawfully against another. Petitioner primarily

---

[4]New York Penal Law § 265.03 ("Criminal possession of a weapon in the second degree") was subsequently amended in 2005 (eff. Dec. 21, 2005), and twice in 2006 (see L.2005, c. 764, § 3;  L.2006, c. 742, § 2; L.2006, c. 745, § 1).  Such amendments are not germane to this habeas petition.

asserts that the People's case heavily relied on testimony that
Petitioner himself gave to the police, and argues that,
throughout this testimony, he repeatedly denied that he intended
to harm anyone.  Rather, Petitioner alleges that he merely meant
to scare away a group of men approaching him late at night, and
this was evident from this testimony.  Furthermore, Petitioner
contends that in this testimony he stated he was in the
neighborhood that evening looking for a person named Elijah and
not Corey Coates.  He also avers that in the same vein, the
People misrepresented any relationship Petitioner had with Corey
Coates as the testimony they relied upon clearly demonstrated
that their conversation at the party two weeks prior to the
shooting was nothing serious.  Petitioner's argument, however,
focuses exclusively on the evidence favoring himself, and ignores
the evidence favoring the prosecution.  The evidence adduced by
the prosecution was more than sufficient to establish Petitioner
guilty of each and every element of both manslaughter in the
first degree and criminal possession of a weapon in the second
degree.

First, Brian Bristol unequivocally identified Petitioner as
the shooter.  He testified that in the early morning hours of
January 1, 2004, he saw Petitioner walking towards his group on
the same side of the street, cross the street, and call out to
them, asking "Where is Cor[e]y at?"  Brian Bristol responded by

saying "Who is that?", upon which Petitioner immediately drew a
firearm and fired shots at the group. He further testified that
he clearly observed Gumbs as the shooter, recognized his face,
and that Gumbs was standing near an illuminated street light when
firing. Mark Bristol corroborated this testimony to the extent
that he testified to witnessing a person cross the street and,
immediately before opening fire, the shooter called out to ask
about a person named Corey. Further, Det. Carey testified that
while Brian Bristol was being interviewed at the precinct shortly
after the incident, he affirmatively stated that Gumbs was the
shooter.

Additionally, police witnesses testified that Petitioner
admitted that he was the shooter but claimed that the shooting
was an accident. He initially told the police that he was
carrying a gun for protection when a group of men on 96th Street
approached him, causing him to become nervous. One of the men
called out to him, causing him to draw the gun in a panic.
Because the hand in which he was holding the gun was shaking, the
gun inadvertently discharged. In his videotape statement,
Petitioner again acknowledged that he fired the gun, albeit
unintentionally. Only at trial did Petitioner claim that the
statements he had made to the police had been coerced, and that
he had not even been at the scene at the time of the incident.
However, Petitioner's own version of the events at trial was

inconsistent with the statements he himself made to police at the precinct after his arrest. Moreover, a firearms expert discredited Petitioner's claim that the shooting was accidental by testifying that a light tap would not discharge a revolver of the type he believed was used in the shooting. According to the expert, such a gun would necessitate around 9 to 11 pounds of force on the trigger in order to fire.

Furthermore, as to intent, at trial the People elicited testimony that Petitioner and Corey Coates had become involved in a verbal altercation two weeks prior to the shooting and that Petitioner had threatened him. Specifically, Petitioner and Corey Coates were attending the same party and became involved in an argument regarding certain disrespectful comments Corey Coates had made about Petitioner's girlfriend. Corey Coates admitted to Petitioner that he had made these comments. Additionally, he told Petitioner that he had previously had a one-night stand with Petitioner's girlfriend. Brian Bristol testified that despite there being no physical altercation between Corey Coates and Petitioner at the party that evening, Petitioner threatened Corey Coates by telling him: "You know my shit. Get down, I lay you down."

Based upon the foregoing evidence, a rational trier of fact could have concluded that the People proved beyond a reasonable doubt Petitioner's intent to cause serious physical injury and

that Petitioner possessed a firearm with the intent to unlawfully use same against another.  The verdict rested almost entirely on issues of witness credibility.  While the People and Petitioner provided conflicting versions of events, resolution of issues of credibility is primarily a matter to be determined by the jury, which saw and heard the witnesses (see People v Romero, 7 N.Y.3d 633, 644-645 [N.Y. 2006]).  The competing versions offered by the People and Petitioner presented such questions of credibility for the jury to resolve (see U.S. v Shulman, 624 F.2d 384, 388 [1980] ["the resolution of issues of credibility is exclusively the province of the jury"]; People v Fisher, 18 N.Y.3d 964, 966 [N.Y. 2012]; People v Romero, 7 N.Y.3d at 644-645).  Further, "the element of intent is rarely proved by an explicit expression of culpability by the perpetrator" and "competing inferences to be drawn regarding the defendant's intent, if not unreasonable, are within the exclusive domain of the finders of fact, not to be disturbed" (People v Bueno, 18 N.Y.3d 160, 169 [N.Y. 2011] [brackets and internal citations omitted]).  Viewing the evidence in the light most favorable to the prosecution (see Jackson, 443 U.S. at 319), a jury could reasonably find that the evidence presented at trial was sufficient to support the convictions, and specifically, that the People proved the intent element for each respective conviction beyond a reasonable doubt (see Gutierrez, 702 F.3d at 113-116).

To the extent that Petitioner contends that the jury verdict was against the weight of the evidence, such a claim is not cognizable on habeas review (see McKinnon v Superintendent, Great Meadow Correctional Facility, 422 Fed.Appx. 69, 75 [2d Cir. 2011]; Correa v Duncan, 172 F.Supp.2d 378, 381 [E.D.N.Y. 2001]; see also Estelle v McGuire, 502 U.S. 62, 67-68 [1991]).  A claim that a verdict is against the weight of the evidence is distinct from an attack on a verdict based on the legal sufficiency of evidence.  Specifically, a weight of the evidence argument is a "pure state law claim" grounded in New York Procedure Law § 470.15(5), whereas a legal sufficiency claim is based on "federal due process principles" (Correa, 172 F.Supp.2d at 381; see Jackson, 443 U.S. at 318-319 [Fourteenth Amendment requires record evidence to reasonably support a finding of guilt beyond a reasonable doubt]; People v Bleakley, 69 N.Y.2d 490, 495 [N.Y. 1987] [weight of the evidence is based on a court's factual review power; sufficiency of the evidence claim is based on the law]).

III. *Petitioner's Sentence was not Excessive or Unduly Harsh*

Petitioner also contends that his sentence of the maximum term of imprisonment on each count for which he was convicted was unduly harsh and excessive when taking into account his youth, as well as his supportive and loving family.

28

In evaluating claims of excessive sentencing, the Supreme Court has articulated a principle of gross disproportionality, which, under the Eighth Amendment, finds unconstitutional only extreme sentences that are "'grossly disproportionate to the severity of the crime'" (<u>Ewing v California</u>, 538 U.S. 11, 21 [2003], quoting <u>Rummel v Estelle</u>, 445 U.S. 263, 271 [1980]; <u>see</u>, e.g., <u>Harmelin v Michigan</u>, 501 U.S. 957 [1991]).  Generally speaking, "[o]utside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare" (<u>Ewing</u>, 538 U.S. at 21 [internal quotation omitted]).  In habeas proceedings, federal courts reviewing sentences imposed by state courts "should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals" (<u>Solem v Helm</u>, 463 U.S. 277, 290 [1983]).  Furthermore, the Second Circuit has repeatedly held that "no federal constitutional issue is presented where ... the sentence is within the range prescribed by state law" (<u>Ross v Gavin</u>, 101 F.3d 687 [2d Cir. 1996] [bracket omitted], quoting <u>White v Keane</u>, 969 F.2d 1381, 1383 [2d Cir. 1992]).

Here, Petitioner was sentenced to a determinate term of 25 years on the manslaughter in the first degree conviction and 15

years on the criminal possession of a weapon in the second degree conviction, with the sentences running concurrently.  The sentences, despite being the maximums allowable, were within New York's prescribed sentencing range (see N.Y. Penal Law § 70.02). Accordingly, Petitioner's argument must fail as it is not a proper basis for habeas relief.

**CONCLUSION**

The application for a writ of habeas corpus is denied, and the petition is dismissed.  Because Petitioner has not "made a substantial showing of the denial of a constitutional right" (28 U.S.C. § 2253[c][2]), the Court declines to issue a certificate of appealability.

**SO ORDERED.**

_____/S/_____

SANDRA L. TOWNES
United States District Judge

Dated:    March 29, 2013
          Brooklyn, New York